VIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EILEEN PISKOREK, ) | |
| ) | No. 13 CV 3831 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Michael T. Mason |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the parties' cross motions for summary judgment. Plaintiff Eileen Piskorek seeks a remand or an outright reversal of the Commissioner's decision to deny her request for a waiver concerning an overpayment of Disability Insurance Benefits ("DIB"). The Commissioner seeks summary judgment affirming the decision to deny the waiver. For the reasons set forth below, Piskorek's motion is granted, and the Commissioner's motion is denied.

## BACKGROUND

Eileen Piskorek first applied for DIB in 1995, claiming that she was disabled because of depression. The Social Security Administration ("SSA") agreed, and Piskorek began receiving DIB shortly thereafter. She applied for Child's Insurance Benefits for her two children and that application was granted as well; her children began receiving benefits at the same time. Almost a decade later, the Administration advised her that she had been overpaid and needed to repay more than $87,000.

Piskorek received a letter dated February 3, 2005, advising that the SSA:

> restarted your Social Security disability payments during your extended period of eligibility because you were no longer doing substantial work. However, we now have information about your work and earnings that could affect your payments. Based upon this information, it appears we will decide that you are not entitled to payments for: March 1999, February 2000 through April 2000, May 2001, July 2001 and continuing. We are writing this letter to give you a chance to give us more information that you want us to consider.

R. 76.

Shortly thereafter, Piskorek advised the SSA to "please stop my disability"; she advised that she had been on a medical leave of absence from the State of Illinois but had started working full time for Streamwood Mental Health Center in April 2004. R. 79-80. The employment information she provided was consistent with the wage/earnings records provided by the employers; she represented that she worked at Rock Creek for about nine months in 1997 and 1998; she worked for just a couple of weeks at Palos Community Hospital; worked about 6 shifts over two months at NovaStaff; and worked about 10 shifts at NurseFinders. R. 84-85. In her communication to the SSA, Piskorek was forthcoming with information about her then current employment with Streamwood. However, she made it clear that she did not want the SSA to contact the employer for fear she would be fired because of her history of depression and anxiety. R. 80, 87.

On February 25, 2005, the SSA determined that Piskorek and her children had, in fact, been overpaid and demanded that they repay more than $87,000 in benefits. Piskorek requested a waiver of the overpayment. Her request was denied on January 19, 2007 and then again on May 8, 2007. Records from those denials highlight the income Piskorek disclosed and suggest that the SSA believed Piskorek knew or should have known that she could not keep getting benefits while she was working and earning

2

substantial income.  *E.g.*, R.125, 132.

Piskorek then requested a hearing before an Administrative Law Judge, and her case was initially assigned to ALJ Joseph Donovan, who held the requested hearing in Orland Park, Illinois on October 16, 2008.  Piskorek appeared, represented by counsel (the same attorney who represents her here).  The ALJ assigned both a medical expert and a vocational expert to appear at the hearing, but he did not call either to testify.  R. 16.  The ALJ did, however, hear argument from Piskorek's attorney and he heard testimony directly from Piskorek.

Piskorek's attorney conceded that she and her children were overpaid but argued that she was without fault in creating or maintaining the overpayment.  In particular, he argued that she was diagnosed in 1996 with major depression and an anxiety disorder, that her impairments were found to be disabling in 1996, that her disabilities continued to the present time, and that they prevented her from really understanding what was going on with respect to her benefits.  R. 138-139.  Counsel argued that, because she was receiving benefits from both the State of Illinois and the Social Security Administration, she believed there was some kind of coordination of benefits between the two, and that communication to the State of Illinois was effective for both agencies.  R. 139.  He argued that, although she did work on again and off again during the years she received benefits, she worked for brief stints before being told she was not fit for the job; in other words, each attempt to return to work was unsuccessful.  R. 140-142.  Counsel also argued that "the regulations concerning trial work period and extended period of eligibility and substantial gainful activity and when a person can work and when they can't is really fairly complex for a layperson."  R. 142.   Her attorney also

3

argued that, because Piskorek was working as a nurse, at a fairly high hourly wage rate, she could satisfy the threshold for substantial gainful activity or "SGA" working very few shifts, for short periods of time. R. 142. Yet, she was still considered to be disabled by the State of Illinois. R. 142. He also argued that her expenses exceeded her income by a significant amount, meaning that repayment would go against the purposes of Tile II. R. 144-145.

Piskorek then testified. She noted that she was first approved for Social Security Disability Insurance Benefits in 1996. R. 146. She testified that, at that time, she had already been receiving disability benefits from the State of Illinois for about six months; she testified that, prior to becoming disabled, she had worked as a nurse for the State of Illinois beginning in about June of 1986. R. 146-147. She testified that, after being adjudged disabled, she worked briefly at various locations – some through the State of Illinois and some through private staffing agencies – but never for very long. R. 148-154. She testified that she resigned from the State in 2003. R. 154. She testified that she did work after that, for Streamwood Mental Health Center beginning in February 2004, and then for Edwards Hospital in Naperville, beginning in June 2005; both jobs lasted about 18 months. R. 156-159. She testified that she went on medical leave from Edwards and then applied again for Social Security Disability Insurance Benefits; her application was approved a month or two before the hearing. R. 159. She testified that she was set to receive $1,643 per month in benefits, but was advised that 100% of that monthly payment was being withheld because of the overpayment. R. 159-160. She testified that she was confused about when and how she had to be reevaluated by the Social Security Administration and about whether working as she was – on again

4

and off again, with sporadic shifts at various places – was ok within the trial work period regulations. R. 160-161.

ALJ Donovan issued his decision on November 10, 2008. R. 16-20. He denied her request for a waiver of the uncontested overpayment, finding that Piskorek was "'not without fault' in causing and accepting the overpayment" and that she "knew or should have known that the disability benefits she received and the Child's Insurance benefits she received for her two children for the period of March 1999, February 2000 through April 2000, May 2001, and July 2001 through November 2004 while she continued to work were not due her." R. 19. The ALJ also determined that "recovery of the overpayment amount would not 'defeat the purpose of the Act.'" R. 19. He therefore determined that the "overpaid total of $87,300.00 must be recovered in incremental amounts." R. 19.

Piskorek appealed, and the Appeals Council denied review on October 5, 2010, finding that there was no evidence to suggest that her depression and anxiety caused her to misunderstand the rules concerning the reporting of income – particularly because she reported her income in the past and was able to report to another agency (the State of Illinois). R. 2-3.

Piskorek then sought review in this court, filing a complaint on December 3, 2010. The case was assigned to Magistrate Judge Susan Cox, who, based upon a stipulation from the parties, remanded the case for further proceedings pursuant to sentence four of section 205(g) of the Social Security Act. *See Piskorek v. Astrue*, No. 10 CV 7705, Agreed Order entered 8/23/11 [29].

On remand, the case was assigned to ALJ Robert Senander, who held another

5

hearing on January 25, 2013. Piskorek appeared, represented by new counsel. At the outset, the ALJ noted that this was an overpayment case, and that there appeared to be no dispute that Piskorek and her children had been overpaid approximately $87,300. R. 261. He explained that the primary issue before him was whether Piskorek knew or should have known about her obligations to report work. R. 261. Piskorek and her attorney agreed, representing that they were "not contesting the amount of the overpayment or that she was in fact overpaid benefits." R. 262. Counsel for Piskorek argued, however, that she was without fault on the overpayment and that it would be a real hardship for her to have to repay the benefits – so much so that requiring repayment would defeat the purposes of Title II. R. 262-263.

The ALJ heard from Piskorek, who again testified that she first began receiving disability benefits in 1996; she testified that, at that time, she received both state disability benefits and federal DIB. She testified that she was working as a psychiatric nurse for the State of Illinois during this time and would work for a time, then have to be evaluated for fitness for duty, then be off for a time. She testified that she officially resigned in 2003, after a fitness for duty evaluation when she was told she could not come back. R. 264. She was sent to a neurological psychiatrist who diagnosed her as bipolar, with major depression and suicidal ideations; she stated that she had terrible anxiety as well. R. 265. When she resigned, she was receiving about $700 per month in state disability benefits and the balance was paid by Social Security disability, R. 264.

She testified that, at the time of the hearing, she was receiving $1,556 per month in Social Security Disability Insurance Benefits. R. 265. She testified that she stopped receiving benefits when she was working at Streamwood Mental Health Center, and

then started receiving them again some time after 2006, when she was put on medical leave at Edwards, though she had to reapply for benefits. R. 266. She testified that she worked for Streamwood for about a year and a half after she left the State of Illinois in 2003. R. 275. She testified that Streamwood terminated her because she "wasn't able to you know function as a nurse there. I made mistakes . . . ." R. 275. She then worked at Naperville Psychiatric Center some time in June of 2005, but was very depressed and had a hard time functioning; she testified that she was ultimately told that if she didn't take medical leave they would have to terminate her. R. 276.

She testified that, during this time, while she was working, she was "severely depressed"; she testified that her husband was abusing her, her sister was dying of cancer and she was just trying to function as best she could; she testified that, as time went by, she got worse and worse, to the point where her boss had to repeat things several times and wasn't sure she knew what she was doing. R. 277.

She testified that she called the State of Illinois' disability program a couple times and thought she was doing everything she was supposed to do in terms of reporting her work activity; she testified that it was her understanding that she could continue to work as a nurse and still get benefits as long as she didn't work 36 months straight in a row. She testified that, to her understanding, working sporadically at different places did not violate the social security rules. R. 278. When asked by the ALJ about the letters sent to her by the SSA concerning her work activity, she testified that she did not remember getting them, but her understanding was that, unless she could work 36 months in a row, she remained eligible for benefits. R. 281-82.

Piskorek's attorney argued that she was confused about the work reporting

7

requirements and the rules about trial work periods and extended periods of eligibility. R. 283. He argued that the rules are complex to begin with, and that it's understandable that someone might be confused about them; that, coupled with the fact that she was suffering from severe mental disabilities, including major depression and anxiety, would excuse her acceptance of the overpayment. R. 284, 287. He argued that, although she had an incomplete understanding of what was required of her, she was trying to do the right thing and she did report her work activities. R. 285. Piskorek testified that she pays $790 a month in rent, R. 287; $188 a month for car insurance and $167 a month for a car payment, R. 288; she pays about $75 a month for electricity, $200 a month for groceries and about $40 a month for prescriptions. R. 288-289. She testified that her only source of income is social security, which is $1,556 a month. In other words, her attorney argued, her expenses exceed her income and it would defeat the purpose of the Social Security Act to require her to repay the benefits. R. 290. He also noted that, in looking at SGA, she may have had a high hourly rate, but she didn't really work very much. R. 291-291.

     The record shows that Edwards terminated Piskorek on April 9, 2007. R. 267. She testified that she was on medical leave for about six months prior to that termination. R. 267. With respect to her job history, Piskorek testified that she worked at Rock Creek for about nine months beginning in 1998, while she was on medical leave from the State of Illinois. R. 267-268. She testified that she worked sporadically through staffing agencies, picking up shifts here and there, making about $30 an hour. R. 269-271. She testified that, between 1998 and 2003, she worked sporadically, getting shifts through the agencies. R. 274. During that time, the longest continuous

8

period of employment she had was about one month.  R. 274.  She testified that she officially terminated her employment with the State of Illinois and stopped working for good in 2003.  R. 273.  She stated that she last worked in 2006, as a nurse at Edwards Hospital.  R. 265.  She also stated that she continues to suffer from severe depression and anxiety.  R. 266.

The records on file demonstrate that Piskorek worked sporadically after becoming disabled. In a work Activity Report dated December 9, 1998, Piskorek indicated that she worked as a registered nurse at the State of Illinois' Tinley Park Mental Health Center from September 1, 1997 to November 30, 1998; she worked 7.5 hours per day, 5 days per week, making about $140 per day.  R. 32.  She noted that she began missing days of work in September 1998 – would work 2 days and then be off 2 days – and her doctor had to write medical notes for her.  R. 33.  Notes written on the report indicate that the SSA determined Piskorek had engaged in SGA until November 30, 1998, when she stopped working due to her disability.  R. 35.  The interviewer noted that Piskorek had "no SGA in 12/98" and that "[b]ased on physician's report she may be able to return to work on 1/4/09."  R. 35.  The record shows that Piskorek made several attempts to work, starting and stopping various stints as a nurse. *See, e.g.*, R. 36.

An April 10, 2000 contact report states that claimant is not currently working; "possible uwa for 3-00."  R. 39.  And another contact report shows that Piskorek appears to have advised the SSA that she was starting work at Tinley Park Mental Health Center on September 20, 2001.  R. 40.  According to the contact report, Piskorek started work 9/20/01 and received her first paycheck on 10/12/01, for $1,400.  R. 40.

9

Written notes show that, by 10/16/01, Piskorek was on a one year leave of absence.  R. 40.

On September 20, 2001, the SSA sent Piskorek a work activity report requesting some additional information because "your trial work period months were exhausted 05/98 and you reported you were earning more than the $740 allowable amount."  R. 41.  Piskorek completed the report October 20, 2001, representing that she was working but had been on medical leave, had missed about 15 days of work at the Tinley Park Mental Health Center because of set backs in her depression and because of panic attacks; she stated that it was "very hard to go back and try to function as an R.N. when they made me feel unfit."  R. 45.  A Wage Information Sheet from Tinley Park Mental Health Center shows that Piskorek earned no wages in 1999; no wages in 9 out of 12 months in 2000 and no wages in 8 out of 12 months in 2001; she earned wages in February, March and April of 2000 (a total of $7,146.53) and she earned wages in September, October, November and December of 2001 (a total of $12,654.18).  R. 50.

NovaStaff provided a similar set of records, showing that Piskorek earned no wages in 8 months in 2001, but earned wages in April, May, June and July (a total of $5,431.75).  R. 54.  She also earned $882.43 in August of 2001 from Palos Community Hospital; she was hired there August 13, 2001 and terminated August 24, 2001.  R. 61.  She worked for Favorite Nurses in September of 1998, earning $544.00; again, that job placement was short-lived.  R. 61.  She worked for NurseFinders in March of 1999, earning $838.75. R. 66.  A note on the NurseFinders record indicates that Piskorek may have come back to the agency in March of 2000, earning $1,113.50 that month.  R. 66.

Records from the State of Illinois Comptroller show that Piskorek worked for the State from August 16, 1997 to November 15, 2003; in 2002, she earned wages in only two months (January and February) for a total of $7,913.89.  R. 72.  She earned wages in just one month in 2003 (November) for a total of $2,058.43.  R. 73.  At Streamwood, she earned income in April, May, June, July, August, September, October, November and December of 2004 (for a total of $59.863.91).  R. 74.  She also earned income from Elmhurst Memorial Hospital in several months in 2004 (February, March, April, May, June and November (a total of $3,499.35).  R. 75.

After hearing the testimony and arguments and reviewing the file, ALJ Senander issued his decision on March 1, 2013.  R. 179-183.  ALJ Senander, like ALJ Donovan, determined that Piskorek knew or should have known that she could not work, earning significant income, and still collect DIB, and that she knew or should have known she was supposed to report her income to the SSA, but did not.  R. 182.  He determined that she lacked credibility and he disbelieved her explanation that she was confused about what she was required to report and about how much she was permitted to work.  R. 181.

Following ALJ Senander's decision, Piskorek again sought review in the Appeals Council.  When the Appeals Council denied her request for review, Piskorek then filed another suit in this court on May 23, 2013, seeking review of this second decision denying her request for a waiver.  Thereafter, the parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on July 3, 2013.   The cross motions for summary judgment followed.

## **DISCUSSION**

When the Social Security Administration overpays a claimant disability benefits, it may recover the overpayment in certain circumstances. Where, however, the recipient is "without fault" and "recovery would defeat the purpose of the Social Security Act" or go against principles of equity and good conscience, the Administration may not recover the overpayment. A finding of "fault" can be based on any of the following: "(a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or (b) Failure to furnish information which he knew or should have known to be material; or (c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect." 20 C.F.R. § 404.507. "In determining whether an individual is at fault, the Social Security Administration will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) the individual has." *Id.*

Here, the ALJ determined that Piskorek and her children were overpaid more than $87,000, and that she was "not without fault" in causing the overpayment. The ALJ made no findings about whether requiring Piskorek to repay the overpayment would go against the purpose of the Act.

Piskorek argues that the ALJ's determination concerning overpayment should be reversed or remanded because the ALJ failed to properly consider her mental capacity; failed to properly weigh evidence from the District Office Adjudicator; failed to support his findings concerning her actual knowledge of her reporting responsibilities; failed to properly analyze the interaction with the State of Illinois; and failed to support his

12

credibility findings. The Commissioner, on the other hand, argues that the ALJ's decision is supported by substantial evidence. We consider the arguments below.

### A. Piskorek's Mental Capacity

Piskorek first argues that the SSA and the State of Illinois both determined that she was "mentally debilitated and entitled to benefits based on her mental condition." Brief, p. 6. Additionally, she argues, the State of Illinois repeatedly deemed her to be unfit to work. Brief, p. 6. And yet, the ALJ rejected her contention that she lacked the mental capacity to understand the reporting requirements. In so doing, the ALJ explained:

> [t]he claimant's work activity was as a registered nurse for various hospitals and the State of Illinois health care facilities. Although counsel argues that the claimant was initially put on disability due to severely disabling depression and that her periods of employment lasted for a month or two or less before she was found unfit for duty and put on medical leave or fired, the claimant has continued this pattern of working as a nurse for several years. A review of her earnings record shows that she did have numerous employers but that she was engaging in work activity consistently over the years. (Exhibit 55). While she may have changed jobs frequently, her education as a registered nurse and her ability to seek new employers and complete application requirements belie any allegation that she did not have the mental capacity to understand the reporting requirements of her work activity when receiving Social Security Disability benefits for herself and her children.

R. 181.

As explained above, the regulations provide that "[i]n determining whether a person is without fault in causing the overpayment of benefits, the ALJ must 'specifically take into account any physical, mental, educational, or linguistic limitation such individual may have . . . .'" *Kainer-Cargile v. Colvin*, No. 11 CV 7435, 2013 WL 5587084, at *4 (N.D. Ill. Oct. 10, 2013)(quoting 42 U.S.C. 404(b); 20 C.F.R. § 404.507).

13

"The decision which must be reached in a fault determination is highly subjective, highly dependent on the interaction between the intentions and state of mind of the claimant and the peculiar circumstances of his situation." *Kainer-Cargile*, 2013 WL 5587084, at *4 (quoting *Begoun v. Astrue*, 2011 WL 307375, 7 (N.D. Ill. 2011)).

Here, despite being told on remand to consider the specifics of Piskorek's mental impairments, the ALJ focused on generalities; he considered her education, but did not consider her mental limitations. He speculated about what someone with Piskorek's education and training should know, but did not factor in her mental limitations. ALJ Senander determined that, because Piskorek was educated and could work as a registered nurse, her claim that she was confused about the requirements and regulations was substantially undermined. He also attached tremendous importance to the fact that she was able to apply for new RN jobs when she lost one. The record is clear that Piskorek jumped around from one job to another. But there is no evidence in the record demonstrating that Piskorek actually applied for all of those different jobs; she worked through a staffing agency for at least part of the time, which would have assigned her to the various locations. Moreover, the evidence is clear that she couldn't keep any of the jobs she was able to get. The same mental condition that allowed her to get all those jobs, kept her from keeping them. The ALJ never mentions this and doesn't really explain why he attaches so much significance to the fact that she was able to obtain opportunities for employment, but attaches no significance to the fact that she couldn't maintain employment. Because the ALJ was relatively dismissive on the issue of how Piskorek's specific mental impairments – impairments that have consistently been determined to render her disabled under the Act – affected her

14

individual ability to understand the requirements and regulations, remand is once again appropriate.

B. <u>Evidence from the District Office Adjudicator</u>

Relatedly, Piskorek emphasizes that a SSA District Office Adjudicator even described her as "confused," thereby giving credence to her claim that she did not understand what was required of her. The ALJ noted the characterization, but declined to give it "much weight" "given the claimant's ongoing work activity and ability to seek employment as a nurse that requires the mental capacity to perform higher-level intellectual activity." R. 182. She argues that the ALJ was wrong to discredit this characterization. We agree. For the reasons explained above, we find that the ALJ was wrong to attach so much significance to Piskorek's work activity and her ability to function (even a little bit) as a nurse, without also considering her inability to work and her inability to sustain any kind of employment.

C. <u>The ALJ's Findings regarding Actual Knowledge</u>

Piskorek next challenges the ALJ's determination that she knew she could not collect benefits while working as she did. The ALJ emphasized that, "[w]hen an individual is awarded disability benefits, the requirement of informing the Social Security Administration of work activity is made known to them." R. 181. He also noted that, "[w]hen she filed the application for child's insurance benefits she signed a statement that her reporting responsibilities had been explained to her," and she "signed the agreement that she must comply with the conditions for reporting for events and to notify the Social Security Administration of earnings." R. 181. Based upon this, the ALJ determined, Piskorek "cannot later state that she was not aware of her responsibilities."

15

R. 181.  The Court agrees that the ALJ's reasoning is somewhat circular here.  Using the ALJ's logic and reasoning, no one who signed these form agreements and received benefits could ever be found to be "without fault" for any overpayment.  That cannot be the case and is not what the regulations provide.

      D.      <u>Interactions with the State of Illinois</u>

Piskorek next argues that the ALJ was wrong to reject her argument that she thought her interactions with the State of Illinois concerning her income and her disability benefits were sufficient to keep the SSA advised of her status as well.  The ALJ gave this argument no weight because of Piskorek's educational background; he also determined that she had demonstrated, by applying to both the State of Illinois and the SSA for benefits, that she knew they were two separate systems.

First, as above, the ALJ's logic suggests that no one with any higher-level education could ever be "without fault" for an overpayment.   The mere fact that she was a registered nurse does not automatically disqualify her from obtaining a waiver for overpayment.  Additionally, having training and experience as a nurse does not make one an expert in interpreting Social Security regulations.  Given that the benefits appear to have been coordinated, it may not have been unreasonable for Piskorek to believe that her reporting to the State was sufficient to keep the federal agency apprised as well.   On remand the ALJ needs to really consider Piskorek's mental capacity – not as a generic registered nurse, but as an individual with legitimate and documented mental impairments that affect her ability to work and function on a daily basis.  If the Commissioner ultimately decides Piskorek is not without fault for the overpayment, that finding should be based on criteria specific to her, and not on generalizations about

16

people like her (i.e., those with an education, or those who work as registered nurses).

### E. The ALJ's Credibility Findings

Finally, Piskorek makes a general challenge to the ALJ's credibility findings. Given that the case is being remanded, we urge the Commissioner on remand to make findings concerning whether Piksorek's mental limitations could have affected her ability to understand what was required of her. We also note that the ALJ disbelieved much of what Piskorek said because she demonstrated through her actions an ability to report when she wanted to. But that evidence – her attempts to report her work activity and even to stop her disability payments when she was working – also supports her claim that she was confused about when and what she was supposed to report and about what she was allowed to do in terms of work under the regulations. As Judge Cole said in *Kainer-Cargile*, these are "not the action[s] of a person intent on gaming the system." 2013 WL 5587084, at *5. The Commissioner should give further consideration to this evidence on remand.

## **CONCLUSION**

For the reasons set forth above, the Court grants Piskorek's motion for summary judgment [25] and denies the Commissioner's motion for summary judgment [29]. The case is remanded for further proceedings consistent with this opinion.

Date: October 7, 2014

E N T E R E D:

_____
MAGISTRATE JUDGE MICHAEL T. MASON
UNITED STATES DISTRICT COURT